IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BENJAMIN VELASQUEZ | : | CIVIL ACTION |
| | : | |
| v. | : | No. 09-517 |
| | : | |
| DAVID DIGUGLIELMO, et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                    **September 28, 2012**

Pro se Plaintiff Benjamin Velasquez, a prisoner in the State Correctional Institution (SCI)

in Albion, Pennsylvania (SCI–Albion), who was formerly housed in the State Correctional Institution

in Graterford, Pennsylvania (SCI–Graterford), brings claims pursuant to 42 U.S.C. § 1983 against

various prison personnel, alleging violations of his First, Eighth, and Fourteenth Amendment rights.

Velasquez's First and Fourteenth Amendment claims arise out of his placement in administrative

custody at SCI–Graterford on two separate occasions in February 2008 and subsequent transfer to

the State Correctional Institution in Huntingdon, Pennsylvania (SCI–Huntingdon), in June 2008,

allegedly in retaliation for grievances he filed about his inadequate medical care.  Velasquez also

alleges Defendants violated his Eighth Amendment rights by denying him treatment for his anxiety

and insomnia during his stay in administrative custody from February to June 2008.  All Defendants

have moved for summary judgment.[1]  For the reasons set forth below, Defendants' motions will be

---

[1] The Defendants in this action include the following SCI–Graterford correctional and medical personnel:  former Superintendent David DiGuglielmo; former Deputy Superintendents John Murray, A.S. Williamson, and Michael Lorenzo; Lieutenant of Security William Radle; former Captain of Security Thomas Dohman; Unit Manager William Banta; Correctional Health Care Administrator Myron Stanishefski; Medical Director Richard Stefanic, M.D.; Restricted Housing Unit Medical Director Felipe Arias, M.D.; and Certified Registered Nurse Practitioner Holly Schweitzer. (Although all of the foregoing Defendants worked at SCI–Graterford during the relevant time frame, Drs. Stefanic and Arias were employed by Prison Health Services, now known as Corizon Health, Inc., the prison's medical care provider.  Schweitzer was employed by MHM Services, the prison's provider of psychiatric care.)  Velasquez also brings claims against former Department of Corrections Secretary Jeffrey Beard and Chief Counsel Timothy Mark.  Three

granted.

**FACTS**[2]

Velasquez is an inmate with a variety of medical issues, including meatal stenosis, a urologic problem[3]; hypertension; and chronic low back pain.  Of particular relevance to this case, he has also suffered from anxiety and insomnia for which he has been prescribed Klonopin and other similar medications intermittently over the past ten years.  Dep. of Benjamin Velasquez 19, Nov. 29, 2011; ECF No. 100 at 26 (progress notes reflecting a February 2006 diagnosis of "Anxiety Disorder NOS").  At some point in 2007, a doctor or psychologist at SCI–Graterford discontinued Velasquez's prescription for Klonopin.  Velasquez Dep. 84-87.

On December 17, 2007, Velasquez met with Holly Schweitzer, a Certified Registered Nurse Practitioner, concerning the renewal of his anxiety and insomnia medication.  *Id.* at 22.  Under the

---

separate motions for summary judgment have been filed on behalf of (1) Schweitzer; (2) Drs. Stefanic and Arias; and (3) all of the remaining Defendants (hereinafter the Correctional Defendants).  Velasquez has responded separately to each of the three pending summary judgment motions and has submitted three sets of differently lettered and/or numbered exhibits.  For clarity's sake, citations to Velasquez's opposition papers and exhibits are to the corresponding electronic document and page number in the form, "ECF No. __ at __."

[2] "On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor."  *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[3] Velasquez contends his urologic problems are the result of side effects he experienced from the medication Trazodone, which he was prescribed for his insomnia in June 2005 as an alternative to Klonopin.  Velasquez alleges he suffered a number of injuries as a result of taking Trazodone, including a shortened penis length, a hole in the underside of his penis which is subject to re-breaking open, and a ruptured dorsal vein on top of his penis.  He also alleges he has to use a urethral dilator in addition to a catheter on a continual basis.  Velasquez's allegations regarding the failure of prison medical personnel to promptly discontinue Trazodone and to adequately treat his resulting urologic issues were the basis for the Eighth Amendment claim in Velasquez's original Complaint, but not in his Amended Complaint.

supervision of Dr. Mark Fishstein, a psychiatrist, Schweitzer prescribed Remeron for Velasquez. *Id.* at 22-24; Schweitzer Aff. ¶ 3.   Velasquez took the new drug, but experienced unpleasant side effects.   Velasquez Dep. 22, 24.   He complained to Schweitzer, who thereafter arranged for him to meet with Dr. Fishstein on December 20.   *Id.* at 25.   Velasquez contends Dr. Fishstein advised him Fishstein would put him back on Klonopin; however, his medication did not change.   *Id.* at 26; ECF No. 95 at 30.

On January 10, 2008, Velasquez saw Schweitzer in the dispensary area of the prison and asked to speak with her.   Velasquez Dep. 26.   Velasquez told Schweitzer he was having side effects from his medication and requested new medication from her, noting he had previously been told he would be put back on Klonopin.   *Id.* at 36-37, 124.   Velasquez also asked Schweitzer who her boss was and told her he was going to write to her boss in Harrisburg because he was not being treated for his medical condition.   *Id.* at 125.

Schweitzer thereafter completed an incident report in which she described her encounter with Velasquez—an encounter she characterized as "inappropriate contact"—as follows:

> The above inmate [i.e., Velasquez] saw me entering the nurse's office on the evening of Thursday, Jan 10th, at approximately 6:45 p.m.   The inmate followed me, and was waiting for me outside the office when I exited.   At that time, there were a few people inside the dispensary, but no other security present in the hallway.   The inmate stated, "hey I need to talk to you".   I told the inmate I did not have time at the moment to speak with him.   He said, "I had a problem with that medication", I replied, "please put in a slip to medical or psychiatry, requesting to be seen".
>
> The inmate then stated, "who is your boss", "I am going to write your boss in Harrisburg".
>
> I then exited the area, as I was not comfortable with the way the inmate approached me, and had already directed him to the appropriate action if there was a concern in regard to medication.

Schweitzer Ex. C.[4]  Velasquez agrees the first two paragraphs of Schweitzer's report are factually accurate; however, he disagrees with her reaction to the exchange, as he maintains he was respectful toward Schweitzer at all times and there were security stations and cameras nearby.  Velasquez Dep. 28, 123, 125-26.

Around this time, Velasquez's brother appears to have called Superintendent DiGuglielmo's office and expressed concern about Velasquez's medical care.  The precise nature of Velasquez's brother's concerns is not clear from the record.  Velasquez has submitted an affidavit from his brother in which his brother affirms he spoke with a secretary in the Superintendent's office and asked for help, and spoke with "Doctor Schweitzer" about Velasquez's medical condition and medication; however, the affidavit does not indicate when the call occurred or what was discussed.[5]  ECF No. 102-1 at 49.  On January 11, 2008, J. Knauer, a Correctional Health Care Administrator, noted in Velasquez's file she had received a message from the Superintendent's office that

---

[4] Schweitzer's incident report is not dated.  Schweitzer asserts she completed the report on January 11, 2008, after discussing her encounter with Velasquez with her supervisors.  *See* Schweitzer Aff. ¶ 5; Schweitzer Ex. D (progress notes from January 15, 2008, referring to prior documentation of incident on January 11, 2008); Pl.'s Ex. 14 (Schweitzer's interrogatory responses); *see also* Decl. of William Radle ¶¶ 1, 5 (stating Lt. Radle received Schweitzer's incident report on January 15, 2008).  Velasquez contends the timing of the incident report is suspicious, as prison rules would have required Schweitzer to complete a report before leaving her shift on the date of the incident.  Velasquez Dep. 126.  However, he agrees Schweitzer wrote the report before he submitted a grievance regarding his medical care on February 18, 2008.  *Id.* at 128.

[5] The affidavit also references a conversation Velasquez's brother had with Velasquez's counselors about a misconduct Velasquez was given because he was trying to get help for his condition caused by the side effects of Trazodone.  ECF No. 102-1 at 49.  The affidavit also does not specify when this conversation took place; however, it could not have occurred in January 2008 because Velasquez had not been charged with misconduct or placed in administrative segregation at that time.  Velasquez contends his brother told Dr. Fishstein "of [Velasquez's] intent to sue for the damage to [his] penis and for denying [him] needed sleeping medication," ECF No. 103 at 2, but the affidavit makes no mention of a lawsuit or a conversation with Fishstein, ECF No. 102-1 at 49.

Velasquez's brother was concerned about a "phone call to Dr. Fishstein."  ECF No. 100-2 at 14.

Knauer reported she had spoken with Fishstein and Schweitzer and Velasquez was "being followed

[with an] appropriate treatment plan."  *Id.*

On January 15, 2008, Schweitzer conducted a review of Velasquez's chart and discussed her

security and medication concerns regarding Velasquez with Dr. Polmueller, the head of psychiatric

services, recounting that Velasquez had become "verbally intimidating" when she declined to discuss

medication issues with him in the dispensary on January 10.  Schweitzer Ex. D.  Polmueller agreed

it was appropriate to avoid the use of benzodiazepines such as Klonopin for Velasquez because of

his alcohol and drug history and current methadone use.  *See id.*[6]

Also on January 15, Velasquez met with A.C. King from the psychiatry department and Lt.

Hawkins regarding his family members' calls to the prison about his deteriorating physical and

mental health.  ECF No. 95 at 30; Velasquez Dep. 139-40.  During the meeting, Velasquez appears

to have signed a mental health informed consent document, consenting to meet with the psychology

department for the purpose of review by the Psychiatric Review Team (PRT).  ECF No. 95 at 41.

Velasquez contends King told him during the meeting he would no longer be treated by the mental

health department, but would be treated by regular sick call, and that the informed consent

memorialized his agreement to this plan.  Velasquez Dep. 139-41.[7]

---

[6] Velasquez questions the authenticity of Schweitzer's January 15 progress notes, asserting such notes "are only written in when you physically talk to a Doctor."  ECF No. 95 at 4.  In fact, the progress notes in Velasquez's medical records include other entries on occasions when Velasquez was not present.  *See, e.g.*, Stefanic Ex. G at 3 (entries for "case review" by Dr. Stefanic and review of an informal complaint from Velasquez).

[7] Neither the informed consent document nor any of Velasquez's greivances referencing the January 15 meeting indicate King told him he would no longer be seen by the mental health department.  *See* ECF No. 95 at 20 (grievance characterizing King as telling Velasquez staff would meet with him

The following day, a PRT meeting was held to review Velasquez's need for psychiatric care. Schweitzer Ex. H; *see also* Schweitzer Ex. E.  At the meeting, which was attended by representatives of the psychology, psychiatry, and medical departments, a decision was made to remove Velasquez from the mental health roster and to have the medical department address his treatment needs. Schweitzer Exs. E, H.  This decision was based in part on the participants' determination that there was no need for Velasquez to continue on the mental health roster "when no identifiable[] psychiatric disorder was present."  Schweitzer Ex. E.  Participants also agreed it was unnecessary to treat Velasquez's insomnia with medication.  *Id.*

In late January or early February 2008, Velasquez complained to Dr. Stefanic about his damaged penis, an interaction he characterizes as a "verbal grievance."  Velasquez Dep. 114-15.  On February 4, Velasquez submitted informal grievances to Correctional Health Care Administrator Myron Stanishefski regarding the inadequacy of the treatment he was receiving for the injuries to his penis, and to Charles Fixx, the Director of Psychological Services, regarding his need for treatment for his anxiety and insomnia.[8]  Decl. of Wendy Shaylor Ex. A.  Stanishefski responded on February 19, noting Velasquez was scheduled to see both the urologist and Dr. Stefanic and directing

---

about the treatment of his insomnia "in a few days"); *id.* at 30 (grievance describing January 15 meeting without mentioning removal from mental health roster).  In addition, the record suggests a decision to have the medical department handle all of Velasquez's treatment needs had not been made as of January 15.  *See* Schweitzer Ex. E (stating the decision to remove Velasquez from the mental health roster was made during a recent PRT meeting and had not been communicated to Velasquez as of February 11, 2008); Schweitzer Exs. C & F (referencing PRT review of Velasquez on January 16, 2008).  Indeed, Velasquez continued to seek medication from mental health providers even after January 15.  *See* ECF No. 95 at 30.

[8] Velasquez characterized these submissions as "DC–135A" memos, an apparent reference to the "DC–135A, Inmate Request to Staff" form Pennsylvania inmates are encouraged to use to resolve their concerns informally before submitting an official inmate grievance.  Stefanic Ex. F (hereinafter "DC–ADM 804") § VI.A.4.

him to bring his concerns to their attention.  ECF No. 100 at 76.  Velasquez also appears to have received a response to his memo to Fixx, as there is a handwritten note on some versions of the memo stating "[o]nly doctors can evaluate/treat and/or prescribe medication" and directing Velasquez to "work conjunctively w/medical and MH staff in determining the best form of treatment for your individual needs," although it is not clear who wrote the note.  ECF No. 95 at 30.

On February 11,  Licensed Psychology Manager Robert Dromboski met with Velasquez to inform him he had been removed from the mental health roster due to the lack of an "identified disorder to treat," and he was no longer to request psychiatric assistance for his insomnia as the medical department would be coordinating all of his care.  *See* Schweitzer Ex. F; Shaylor Decl. Ex. A.  Dromboski thereafter sent an email to Schweitzer, copied to Stanishefski, Fixx, and Mental Health Director Robert Maier, reporting on the meeting.  Schweitzer Ex. F.

On February 18, Velasquez filed a formal grievance (no. 218661) regarding the prison's failure to treat his insomnia and other medical problems.  Shaylor Decl. Ex. A.  Velasquez alleged a pattern of deception by prison officials, including King's representation on January 15 that staff would meet with him "in a few days" about the treatment of his insomnia and Dromboski's representation on February 11 that Stanishefski would "call [him] over" on February 13 to treat him for his insomnia, neither of which happened.  *Id.*  He also referred to the medical problems he had experienced from taking Trazodone and requested "proper medication; penis repaired; [and] monetary compensation."  *Id.*  Although Velasquez submitted his grievance on February 18, the grievance coordinator at SCI–Graterford did not receive it until two days later on February 20.  *Id.*; Shaylor Decl. ¶ 4.

On February 19, concerned by the psychology department's delay in communicating the

7

decision to remove Velasquez from the mental health roster to him, Schweitzer sent a letter to William Radle, the Lieutenant assigned to internal security at SCI–Graterford, following up on her earlier incident report regarding Velasquez. Schweitzer Ex. H. In her letter, Schweitzer elaborated on the fear she felt during her January 10 encounter with Velasquez based on his demeanor in approaching her that night, as well as on an earlier occasion in December 2007, when he "presented to [her] as unreasonable and demanding in his pursuit of a particular medication." *Id.* Schweitzer explained she had omitted details of the fear element of the encounter from her original incident report believing the situation would be promptly addressed by the psychology department; however, given the delay in enacting the PRT decision, she continued to have safety concerns regarding Velasquez. In particular, Schweitzer noted Velasquez apparently had been present in the "J treatment area" (presumably within the mental health department) on January 31, notwithstanding the decision made at the PRT meeting two weeks earlier.[9] *Id.* Schweitzer's letter concluded by requesting a separation from Velasquez due to her fear and apprehension of him and "the unpredictability of possibly meeting him again within the prison." *Id.*

The following day, Radle placed Velasquez in administrative custody in the Restricted Housing Unit (RHU) pending an investigation of Schweitzer's allegations. Radle Decl. ¶ 7 & Ex. C. The form memorializing Radle's action lists the "incident date" as January 10, 2008, the date of Velasquez's encounter with Schweitzer in the dispensary, but does not specifically mention Schweitzer, instead describing the reason for the action as "the inmate is a danger to himself/herself

---

[9] This remark appears to be a reference to Velasquez's February 4 memo to Fixx in which Velasquez stated he had seen Donald Winnfield in the "Hospital area" on January 31, 2008, and "explained [his] condition in detail." Shaylor Decl. Ex. A; *see also* Schweitzer Ex. H (acknowledging receiving a copy of a letter from Velasquez the week of February 5 in which he "state[d] he met with psychology staff on January 31st in the J treatment area").

or others."  Radle Decl. Ex. C.

On February 22, Radle interviewed Schweitzer unofficially and reported the following to

DiGuglielmo and Deputy Superintendents John Murray, Michael Lorenzo, and Alan Williamson:

> [i]t appears that inmate Velasquez is pursuing RN Schweitzer, in what she described
> as inappropriate manner, but I cannot determine at this point if its over an attraction
> he has for her or if its over an issue he has with her concerning his medication.
> Inmate Velasquez has been known to sell other medications he has been prescribed
> and was asking RN Schweitzer to recommend he be place[d] on Klonopin.

ECF No. 95 at 54; Radle Decl. ¶¶ 9-10.  Radle also advised Schweitzer had requested a separation

from Velasquez, whom he had placed in administrative custody "pending direction from PRC [i.e.,

Program Review Committee]."  ECF No. 95 at 54; Radle Decl. ¶ 10.

Because Velasquez had been transferred to the RHU, he missed a scheduled appointment

with Dr. Stefanic on February 22; however, he was seen in the RHU by Dr. Arias for renewal of

methadone for his chronic pain.  Stefanic Ex. G at 4, 15.

On February 27, the PRC saw Velasquez and decided to return him to the general prison

population the next day.[10]  Radle Decl. ¶ 12; ECF No. 95 at 49.  Murray notified Schweitzer,

Stanishefski, Fixx, DiGuglielmo, Williamson, Lorenzo, and Radle of the decision via email, noting

that while it appeared Velasquez had been "attempting to manipulate or convince Nurse Schweitzer

(and other staff) to change his medication," the Department was concerned it could not transfer an

inmate every time this type of incident occurred.  ECF No. 95 at 49.  Murray also noted Velasquez

should have no reason to come into contact with Schweitzer since he was not being followed by the

mental health department.  *Id.*

---

[10] Although Velasquez had requested sick call on February 27, because he was at PRC, he was not
in his cell for sick call.  *See* Stefanic Ex. G at 4; ECF No. 100 at 3.

After appearing before the PRC, Velasquez wrote to the grievance coordinator to cancel his February 18 grievance, noting the PRC had "corrected the need to go forward [with] that grievance." Shaylor Decl. Ex. B. The grievance coordinator acknowledged receipt of the withdrawal on February 28. *Id.* Ex. C. Meanwhile, Stanishefski denied the grievance, noting Velasquez had been scheduled to see Dr. Stefanic on February 21 but was a "no-show" due to his transfer to the RHU, and advising Velasquez a second appointment had been made for him and that he would also be seen by a urologist in the near future. Stefanic Ex. C. Stanishefski also reiterated that Velasquez had been discharged from psychiatric care and would be followed by Dr. Stefanic.

On February 28, Schweitzer responded to Murray's email regarding the PRC's decision not to transfer Velasquez. Schweitzer Ex. J. In her email, Schweitzer sought to correct Murray's misimpression regarding her reasons for requesting a separation from Velasquez, clarifying it was not simply his inappropriate demands for a particular medication that caused her concern, but his behavior toward her on January 10, which she perceived as threatening. *Id.* She also requested a face-to-face meeting with Murray to further address her safety concerns. In the meantime, Velasquez was released from the RHU and returned to the general prison population.[11]

On February 29, Velasquez saw physician assistant Kathleen Franks at sick call complaining of insomnia and of the "psych" department's refusal to prescribe him a sleep aid. ECF No. 100 at 52. At his deposition, Velasquez testified he begged Franks for medical help for his insomnia, explaining his heart could not "take [it] any longer without going to sleep." Velasquez Dep. 35-36.

---

[11] The same day he was released from administrative custody, Velasquez saw Dr. Metro at Albert Einstein Medical Center regarding his urologic issues. Stefanic Ex. G at 5. When he returned from his urology appointment, Velasquez saw a physician assistant at SCI–Graterford who wrote orders for Velasquez's new prescriptions, which were later reviewed by Dr. Stefanic. *Id.* at 6, 16.

Franks's progress notes describe Velasquez as "very agitated," "animated," and "insistent," and list her assessment of Velasquez as "? Insomnia" and her plan as "[r]eturn to psych."  ECF No. 100 at 52.  Velasquez contends Franks ordered him Dofetilide for his heart and Ambien for his insomnia, Velasquez Dep. 36-37; however, Franks's progress notes do not indicate she ordered any medication for Velasquez, nor is there any medication order from Franks on the physician's order form in Velasquez's file, Stefanic Ex. G at 16 (showing medication orders by other medical personnel on February 28 and March 3, but not on February 29).  Velasquez maintains Stefanic removed Franks's medication order from his medical records, but admits he has no evidence of this.  Velasquez Dep. 95, 112-14.

Also on February 29, Murray met with Schweitzer and Dr. Fishstein, who provided him with additional information regarding their safety concerns about Velasquez.  Radle Decl. ¶ 14 & Ex. D; ECF No. 95 at 54.  In a letter to Murray after the meeting documenting their reasons for continuing to pursue a separation from Velasquez, both Schweitzer and Fishstein described encounters with Velasquez in which he was unrelenting, intimidating, and threatening in his demands and pursuit of them.  Radle Decl. Ex. D.  Dr. Fishstein expressed concern this behavior raised a "clear possibility" of an act of aggression by Velasquez.  *Id.*  After speaking with Schweitzer and Fishstein, Murray advised Radle he was having Velasquez placed in administrative custody and believed a separation was warranted.  Murray directed Radle to speak with Schweitzer and Fishstein and to prepare a report for the PRC.  ECF No. 95 at 54.  Velasquez was thereafter returned to the RHU as "a danger to himself or others," per Murray's order.  ECF No. 95 at 33.

Following his return to the RHU, Velasquez experienced a delay in receiving his medications.  He did not receive his regular blood pressure and pain medications for three days, and

he never received the Ambien he believed Franks had ordered for him.  Velasquez Dep. 39-41.  On

March 4, 2008, Velasquez experienced what he believed was a heart attack.  *Id.* at 58.  Lt. Radle took

Velasquez to the dispensary, where a nurse took his vital signs and administered an EKG, all of

which were normal.  *Id.* at 100.  Velasquez also saw physician assistant J.S. Korszniak complaining

of anxiety.  Korszniak noted Velasquez's vital signs were stable and he had no shortness of breath.

Stefanic Exhibit G at 7.[12]

The PRC reviewed Velasquez's placement in administrative custody on March 5 and

continued his administrative custody status, noting a transfer petition was pending.  ECF 100-2 at

37.  Velasquez appealed the PRC's decision to DiGuglielmo.  ECF No. 100-2 at 38.

On March 9, Velasquez saw Dr. Arias in the RHU and again requested medication for

insomnia.  Stefanic Ex. G at 7.[13]  Arias's progress notes reflect he advised Velasquez to sign up for

psychiatric sick call.  Stefanic Ex. G at 7 ("Advised to sign for Ψ sick call").  Velasquez contends he

showed Arias he had been discharged from psychiatric care and Arias therefore had an obligation

to treat him for his insomnia.  Velasquez Dep. 104.

On March 10, DiGuglielmo sustained Velasquez's placement in administrative custody,

explaining Velasquez had been returned to the RHU as a possible danger to others after prison

officials received additional reports from unidentified health care providers who felt their security

was jeopardized as a result of their interactions with Velasquez.  ECF No. 100-2 at 39.  DiGuglielmo

---

[12] Korszniak's notes reflect a plan to follow up with psychiatry; however it is not clear whether this was communicated to Velasquez.  *Id.* (listing a plan to "F/U [with] Ψ").

[13] The parties dispute the circumstances surrounding this encounter.  Velasquez contends he saw Dr. Arias at sick call.  Velasquez Dep. 103.  Dr. Arias contends Velasquez had not signed up for sick call on March 9, but instead approached Arias when he was examining other inmates.  Verification of Felipe Arias, M.D. ¶ 18.

also noted he concurred in the PRC recommendation that Velasquez be transferred.  *Id.*  Velasquez appealed DiGuglielmo's decision to Department of Corrections Secretary Jeffrey Beard on March 12, ECF No. 100-2 at 40, but his appeal was denied by Deputy Chief Counsel Timothy Mark on March 31, ECF No. 100-2 at 43.

On March 17, Velasquez wrote to Deputy Superintendent Murray regarding the lack of treatment for his insomnia in the RHU.  ECF No. 100-2 at 41.  Two days later, on March 19, he saw Dr. Stefanic for "POC Review."  Stefanic Ex. G at 7.  Stanishefski was also present.  Velasquez Dep. 106.  Stefanic observed Velasquez was in "no acute distress," and addressed Velasquez's medical needs with respect to his meatal stenosis, hypertension, insomnia, and low back problems.  Stefanic Ex. G at 7; Verification of Richard Stefanic, M.D. ¶ 19.  For Velasquez's insomnia, Stefanic ordered Velasquez to attempt to obtain a natural sleep pattern.  Stefanic Verification ¶ 19; Stefanic Ex. G at 7.  Stefanic believed this was the appropriate treatment since Velasquez's mental health providers felt he did not have any mental health disorder preventing him from sleeping.  Stefanic Verification ¶¶ 8, 19.  Stefanic also avers "Velasquez received education on how to obtain a normal sleep pattern."  *Id.* ¶ 22.  Velasquez agrees he discussed his insomnia with Dr. Stefanic on March 19, but contends Stefanic told him "the human body can go without sleep for almost two months without any hurt" and that he would have to talk to Stanishefski about insomnia medication.[14]  Velasquez Dep. at 109-10; *see also* ECF No. 100 at 4.  Velasquez perceived Stefanic's main concern at the March 19 meeting to be whether Velasquez was going to sue regarding his "penis situation."  *Id.* at

---

[14] Although Velasquez suggested at his deposition that Stefanic did not tell him of the treatment plan for Velasquez to obtain a normal sleep pattern, Velasquez Dep. 111, Velasquez's own complainst about his medical treatment refer to a "decision to force [him] into a natural rhythm of sleep," ECF No. 102-1 at 20.

108.[15]

Although Velasquez continued to see medical personnel regularly during the remainder of his stay in the RHU at SCI–Graterford, the progress notes in his medical chart do not appear to reflect any further complaints of insomnia.

Velasquez also continued to pursue his complaints about his placement in administrative custody and the inadequate medical care he was receiving in the RHU.  On March 27, Velasquez requested to see state troopers to file a criminal complaint against prison staff for attempted murder based on the denial of medical treatment for his insomnia, but his request was denied, possibly by Unit Manager Banta.  ECF No. 102-1 at 43; *see also* ECF No. 102 at 9.  Velasquez contends he sent a summary of his efforts to file a criminal complaint to Beard.  ECF No. 102-1 at 43; ECF No. 102 at 9.

On April 9, Velasquez filed a formal grievance (no. 224857) alleging he was being denied treatment for insomnia.  Stefanic Ex. D.  The grievance coordinator rejected the grievance on the basis that the issues presented had been addressed in Velasquez's prior (withdrawn) grievance.  *Id.* Velasquez appealed, but DiGuglielmo upheld the rejection on May 13, stating Velasquez's "health care issues ha[d] been addressed" and directing him to "work with medical staff to correct" any remaining problems.  *Id.*

On April 20, Velasquez submitted an informal grievance to Stanishefski asking why he was still in the RHU and noting he had been denied treatment for his insomnia and panic attacks.  ECF

---

[15] Based on statements in Velasquez's later-filed formal and informal grievances, it appears he questioned Dr. Stefanic and Stanishefski at the March 19 meeting as to why he was in the RHU.  *See* ECF No. 100-2 at 18, 28.  By Velasquez's account, Stefanic and Stanishefski denied knowing why Velasquez had been transferred and stated they had never felt disrespected or threatened by him.  *See id.* at 18.

No. 100 at 32.  Velasquez stated although Stanishefski had told him he was discharged from psychiatric care and would be treated by Dr. Stefanic, Stefanic was not treating him, and he was unable to get psychiatric help.  *Id.*

On April 28, while his appeal from the denial of grievance no. 224857 was pending, Velasquez wrote to Secretary Beard alleging he was being denied medical care for his urologic condition and insomnia, and his placement in the RHU was retaliatory and violated his due process rights. ECF No. 100-2 at 17-22.  A staff assistant in the Deputy Secretary's office at the Department of Corrections responded to Velasquez's April 28 letter on May 21.  ECF No. 100-2 at 27.  As to Velasquez's retaliation and due process concerns, the response referred Velasquez to Deputy Chief Counsel's Marks's March 31 denial of his administrative custody placement and stated there did not appear to be any plans to transfer Velasquez to another institution at the time.[16]  *Id.*  The response directed Velasquez to speak to Stanishefski regarding his medical issues.  *Id.*

On May 28, Velasquez appeared before the PRC, which continued his placement in administrative custody, noting he was in administrative custody due to separation from staff and a transfer was pending.  ECF No. 100-2 at 45.  Velasquez appealed the PRC's decision to Superintendent DiGuglielmo, who sustained the placement on June 4, noting it was "for separation from a staff person who continues to feel very threatened and fearful," but allowed Velasquez certain privileges.  ECF No. 100-2 at 46-47.  Velasquez appealed DiGuglielmo's decision to the Chief Hearing Examiner's Office, but Mark again sustained the placement on June 23.  ECF No. 100-2 at

---

[16] It is not clear when a final decision to transfer Velasquez to another prison was made.  Radle formally recommended that Velasquez be separated from Schweitzer in a March 28 memo to Lorenzo, citing Dr. Fishstein's assessment that Velasquez posed a security risk to Schweitzer and Schweitzer's own fear of retaliatory actions from Velasquez.  ECF No. 102-1 at 46.

48-49.

In addition to pursuing the above appeals, Velasquez filed another formal grievance (no. 230505) regarding the PRC's decision on May 29, alleging his placement was in retaliation for his medical grievance and violated his due process rights.  ECF No. 100-2 at 28.  Murray denied the grievance on June 3, explaining DiGuglielmo had "authorized a separation transfer to be entered between [Velasquez] and a staff person at this facility."  ECF No. 100-2 at 29.[17]  On June 7, Velasquez appealed the denial to DiGuglielmo, who upheld Murray's response on June 20.[18]  ECF No. 100-2 at 31-32.  On July 2, Velasquez sought final review by the Chief Hearing Officer, alleging DiGuglielmo's decision was contrary to fact and law, as he had never been told what he did, ECF No. 100-2 at 33, but did not receive a response.

Meanwhile, on June 2, Banta submitted a permanent transfer petition requesting that Velasquez be "permanently transferred and separated from CRNP Holly Schweitzer" based on Velasquez's intimidating behavior toward Schweitzer on January 10, which Schweitzer and Fishstein agreed was part of a pattern of increasingly demanding and intimidating behavior by Velasquez in pursuit of a desired medication.  Schweitzer Ex. M.[19]  The transfer petition was approved on June 16, 2008, Radle Decl. ¶ 16, and Velasquez was transferred to SCI–Huntingdon on June 22, 2008,

---

[17] Velasquez wrote to Murray about his grievance on June 3, explaining he felt the continuation of his placement in the RHU was unwarranted, as Dr. Stefanic and Stanishefski had confirmed he had done nothing wrong.  ECF No. 100-2 at 30.  Murray appears to have responded to Velasquez with a handwritten note that reads, "I can't help it, she feels threatened by you.  I've known you for years, you have not been a problem for me."  *Id.*

[18] DiGuglielmo declined to address Velasquez's medical complaints, which were not raised in his initial grievance.  ECF No. 100-2 at 32.

[19] The petition noted previous transfer requests had been denied by SCI–Dallas and SCI–Chester. Schweitzer Ex. M.

Velasquez Dep. 40.  Velasquez contends that after he was transferred to SCI–Huntingdon, he was seen by the psychiatry department, which prescribed Klonopin for him again.  Velasquez Dep. 171.

**DISCUSSION**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material" facts are those facts "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Velasquez alleges Drs. Stefanic and Arias violated his Eighth Amendment rights by failing to treat him for anxiety and insomnia while he was in the RHU.  He also brings a First Amendment retaliation claim against Dr. Stefanic, alleging Stefanic denied him medication for his insomnia—including the Ambien he contends was ordered for him on February 29—in retaliation for his January 18 grievance and oral complaints about the inadequacy of his medical care.

As a threshold matter, Stefanic and Arias argue summary judgment should be granted in their favor because Velasquez failed to exhaust available administrative remedies prior to filing this action, as required by the Prison Litigation Reform Act (PLRA).  Under the PLRA's mandatory exhaustion provision, a prisoner may not bring a § 1983 action "with respect to prison conditions . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  To satisfy this requirement, a prisoner-plaintiff must "properly" exhaust his claims in accordance with

17

"the prison's administrative regulations governing inmate grievances." *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004); *see also Woodford v. Ngo*, 548 U.S. 81, 84, 94-95 (2006) (holding the PLRA requires "proper exhaustion" in compliance with the prison system's "critical procedural rules"). "[C]ompliance with the administrative remedy scheme will be satisfactory if it is substantial." *Nyhuis v. Reno*, 204 F.3d 65, 77-78 (3d Cir. 2000).

The Pennsylvania Department of Corrections has a three-step procedure for review of inmate grievances. *See* DC–ADM 804; *Spruill*, 372 F.3d at 232. An inmate initiates the formal grievance process by submitting a written grievance to the facility grievance coordinator on the prescribed form.[20] DC–ADM 804 § VI.A.6. Upon receipt of an initial review decision from the appropriate grievance officer, an inmate may appeal the initial review decision to the facility manager (i.e., the prison superintendent). *Id.* § VI.C.1.b. Finally, an inmate dissatisfied with the facility's manager's disposition may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals. *Id.* § VI.D.1.b. To properly exhaust a grievance, an inmate must pursue all three levels of review. *Cf. Spruill*, 372 F.3d at 232 (holding a prisoner whose "grievances went through all [three] stages and were denied" had properly exhausted administrative remedies available under DC–ADM 804).

Velasquez filed three formal grievances during the relevant time period. His initial grievance (no. 218661), filed on January 18, raised concerns regarding health care providers' failure to treat his insomnia, Shaylor Decl. Ex. A. However, this grievance was not properly exhausted because Velasquez withdrew it on January 27, the same day Stanishefski, to whom the grievance had been referred for a response, denied it. *See id.* Ex. B; Stefanic Ex. C. Velasquez filed a second grievance

---

[20] While inmates are encouraged to attempt to resolve their concerns informally by use of a "DC–135A, Inmate Request to Staff" or through direct conversation prior to filing an official grievance, such efforts are not mandatory. DC–ADM 804 § VI.A.4.-5.

(no. 224857) on April 9, again complaining he was being denied treatment for his insomnia. Stefanic Ex. D.  Although Velasquez appealed the denial of this grievance to DiGuglielmo, he did not seek review of DiGuglielmo's decision upholding the denial of the grievance by the Office of Inmate Grievances and Appeals.  *See id.*  As a result, Velasquez failed to properly exhaust this grievance as well.

On May 29, Velasquez filed a third grievance (no. 230505) regarding the PRC's May 28 decision to continue to hold him in administrative custody.  ECF No. 100-2 at 28.  In this grievance, Velasquez alleged his continuation on administrative custody status was in retaliation for his earlier medical complaint and stated he had been denied access to his property, glasses, legal work, and the commissary, but did not raise any complaints regarding his medical care.  *Id.*  In contrast to his prior grievances, Velasquez appears to have fully exhausted his May 29 grievance, having appealed Murray's denial of the grievance to DiGuglielmo,[21] and having thereafter appealed DiGuglielmo's decision to the "Chief Hearing Examiner."[22]  *Id.* at 31, 33-34.  Because Velasquez did not raise any issues regarding his medical care in his original grievance, however, his pursuit of the grievance did

_____

[21] Velasquez made reference to his medical issues in his appeal to DiGuglielmo, noting his complaints about "not receiving the proper medication and wanting my damaged penis repaired" were justified and respectful and therefore could not be used as a basis to keep him in administrative custody.  ECF No. 100-2 at 31.  Velasquez did not complain he was being denied medical treatment, and DiGuglielmo declined to address Velasquez's medical issues in any event as they "were not mentioned in the initial grievance."  *Id.* at 32; *see also* DC–ADM 804 § VI.C.1.c. (grievance policy providing "[o]nly issues that were raised for Initial Review, determinations of frivolousness, and placement on grievance restriction may be appealed" to the Superintendent).

[22] Velasquez appealed DiGuglielmo's decision to the Chief Hearing Examiner on July 2 and then, apparently having received no response, submitted a further inquiry on August 3.  ECF No. 100-2 at 33-34.  Velasquez thereafter received a response from the Secretary's Office of Inmate Grievances and Appeals stating the Office had "no prior record of receipt of an appeal from you regarding this issue."  *Id.* at 35.

not exhaust available administrative remedies with respect to the Eighth Amendment claim he now seeks to pursue against Drs. Stefanic and Arias and the First Amendment retaliation claim he seeks to pursue against Stefanic.[23]  *See Hennis v. Tedrow*, No. 12-1303, 2012 WL 3184462, at *3 (3d Cir. Aug. 7, 2012) (holding prisoner had exhausted administrative remedies only with respect to claims raised in grievance and affirming dismissal on exhaustion grounds of claims and defendants not mentioned in grievances); *Stewart v. Kelchner*, 358 F. App'x 291, 296 (3d Cir. 2009) (holding grievance complaining of allegedly inadequate medical treatment for a MRSA infection did not constitute exhaustion as to claim regarding unsanitary and overcrowded conditions that allegedly gave rise to a MRSA epidemic).

Velasquez argues he has satisfied the exhaustion requirement irrespective of his formal grievances because he fully exhausted an informal grievance based on his April 28 letter to Beard and because he completed two full rounds of administrative review of the PRC's decisions regarding his administrative custody status pursuant to DC–ADM 802.  Both arguments lack merit.

In his April 28 letter to Beard, Velasquez raised a number of concerns regarding his placement in administrative custody, including that health care providers were denying him adequate medical care for his insomnia.  ECF No. 100-2 at 19-20.  At the time he submitted the letter, Velasquez was actively pursuing grievance no. 224857 regarding the denial of medical treatment,

---

[23] Velasquez's First Amendment claim against Dr. Stefanic is based on the allegation Stefanic denied Velasquez treatment for his insomnia in retaliation for his formal and informal grievances and complaints. Am. Compl. ¶ 33(a); Velasquez's Opp'n to Stefanic's Mot. for Summ. J., ECF No. 100 at 19 ("The adverse action by Dr. Stefanic was to punish Plaintiff for his protected conduct by denying him needed medical treatment for insomnia . . . ."). Although Velasquez alleges Dr. Stefanic colluded with Stanishefski, Dohman, Radle, and Murray to punish him for exercising his constitutional rights, Am. Compl. ¶ 39, he does not allege Stefanic had any involvement in the decision to place (or continue) him in administrative custody.  Nor is their any evidence he played any such role.

having appealed the denial of that grievance to DiGuglielmo only a week earlier on April 21.

Stefanic Ex. D.  As the prison grievance process was not only available to Velasquez but being

actively used by him when he wrote to Beard, this Court cannot conclude the April 28 letter

constituted substantial compliance with the prison system's administrative remedy scheme.[24]  *See*

*Banks v. Roberts*, 251 F. App'x 774, 776 (3d Cir. 2007) (holding a prisoner who filed a lawsuit

before receiving "final determinations from his administrative filings and complet[ing] the appeal

process as to those determinations" had not met the PLRA's exhaustion requirements).

Nor has Velasquez properly exhausted his claims against Drs. Stefanic and Arias based on

his use of the procedures set forth in DC–ADM 802 to appeal the PRC's decisions approving and

continuing his placement in administrative custody on March 5 and May 28, respectively.  DC–ADM

802, the Department of Corrections' administrative custody policy, governs review of issues relating

to an inmate's administrative custody status.  Pursuant to DC–ADM 802, an inmate "may appeal the

decision of the PRC concerning his/her initial confinement in AC [i.e., administrative custody] to

the Facility Manager/designee within two days of the completion of the hearing," and may "appeal

the initial decision of the Facility Manager/designee to continue him/her in AC confinement to the

Office of Chief Hearing Examiner."  DC–ADM 802 § 2.C.1.-2.  An inmate may also appeal a

decision of the PRC "to continue the inmate in AC following the 90-day review."  *Id.* § 2.C.5.  For

issues unrelated to an inmate's administrative custody status, however, the grievance procedures set

forth in DC–ADM 804 remain applicable.  *See Lyons v. Sec. of Dep't of Corr.*, 445 F. App'x 461,

464 (3d Cir. 2011) (noting DC–ADM 804 grievance procedures remain available to inmates in

---

[24] Notably, Beard's office did not address Velasquez's allegations regarding his medical issues on the merits.

prison's Special Management Unit for issues other than challenges to administrative custody and inmate discipline); *Boyd v. Dep't of Corr.*, 32 F. App'x 16, 17-18 (3d Cir. 2002) (distinguishing claims challenging inmate's initial confinement and continuing placement in administrative custody from claims unrelated to his custody status, including claim regarding denial of medical assistance, for exhaustion purposes); *cf. Mack v. Curran*, 457 F. App'x 141, 145 (3d Cir. 2012) (holding inmate's placement in RHU did not render DC–ADM 804 grievance procedure unavailable).[25] Because Velasquez's complaints regarding Drs. Stefanic and Arias's failure to treat his insomnia do not constitute a challenge to the PRC's decisions with respect to his administrative custody status, Velasquez was required to pursue these complaints via the DC–ADM 804 grievance procedures.

Moreover, although Velasquez availed himself of the procedures outlined in DC–ADM 802, his appeals primarily concerned the propriety of his confinement in administrative custody.  In his appeals from the PRC's March 5 decision, Velasquez disputed there was any basis to separate him from health care staff.  *See* ECF No. 100-2 at 38, 40.  While Velasquez referenced his efforts to obtain help for insomnia at sick call on February 29, emphasizing in his second-level appeal that he

---

[25] In 2011, DC–ADM 802 was amended to provide

> [a]ll issues concerning an inmate's placement in AC custody or the duration, conditions or other circumstances of his/her AC custody must be addressed through the procedures set forth in this directive and may not be addressed through the procedures set forth in DC–ADM 801 or DC–ADM 804.  An inmate is required to raise any issue concerning the duration or other conditions of his/her AC custody during the regularly scheduled PRC review.

DC–ADM 802 § 2.D.9.  This provision was not in effect when Velasquez was in administrative custody at SCI–Graterford in 2008, at which time DC–ADM 802 had been interpreted to "govern[] only challenges to initial or continued confinement in administrative custody," and not to preclude inmates from seeking administrative relief under DC–ADM 804 regarding other issues.  *Lyons v. Beard*, No. 07-2278, 2009 WL 604139, at *5 (M.D. Pa. Mar. 9, 2009), *aff'd*, 445 F. App'x 461 (3d Cir. 2011).

was at all times respectful in doing so, he did not make any complaints about ongoing denial of medical treatment.  *See* ECF No. 100-2 at 38, 40.  In his appeals from the PRC's May 28 decision, Velasquez again complained the decision to continue him on administrative custody status was unwarranted as he had never disrespected any staff.  *See* ECF No. 100-2 at 46, 48.  In his initial appeal to DiGuglielmo, Velasquez also complained he was being denied medical treatment for his insomnia while in administrative custody, ECF No. 100-2 at 46; however, he did not mention this complaint in his appeal to the Chief Hearing Examiner's Office, ECF No. 100-2 at 48.

Finally, Velasquez suggests exhaustion should be excused because he "never had his reading glasses or legal materials," and "[t]he only instruction that was available to [him] was that on the front page of the grievance itself."  ECF No. 100 at 15.  It is apparent from Velasquez's use of the grievance process, including his resort to all three levels of the review process with respect to grievance no. 230505, that these considerations did not prevent Velasquez from utilizing the grievance system.  Because Velasquez failed to exhaust available administrative remedies with respect to his complaints that Drs. Stefanic and Arias failed to treat his insomnia, and that Stefanic did so in retaliation for his prior complaints and grievances concerning his medical care, summary judgment will be granted in favor of Drs. Stefanic and Arias.

Velasquez brings a First Amendment retaliation claim against all of the remaining Defendants, alleging his placement in administrative custody on February 20 and 29 and transfer to SCI–Huntingdon in June 2008 were in retaliation for his February 18 grievance and other complaints he made about his medical care.  He alleges the Correctional Defendants (i.e., DiGuglielmo, Murray, Williamson, Lorenzo, Radle, Dohman, Banta, and Stanishefski) either participated in the retaliation or knew about it and failed to act.  He alleges Schweitzer colluded in the retaliation by fabricating

23

reports regarding her security concerns about Velasquez based on her interaction with him on January 10.  Velasquez further alleges the Correctional Defendants were deliberately indifferent to his need for treatment for his insomnia in violation of his Eighth Amendment rights, and deprived him of due process.

To prevail on a retaliation claim, a prisoner-plaintiff must prove (1) he engaged in constitutionally protected conduct; (2) prison officials subjected him to an adverse action sufficient to deter a person or ordinary firmness from exercising his constitutional rights; and (3) "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (citation omitted).  Even if the prisoner proves a prima facie case of discrimination, "prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.* at 334.

The Correctional Defendants do not dispute, for summary judgment purposes, that Velasquez has established the first two elements of a retaliation claim.[26]  Rather, they argue summary judgment

---

[26] The Correctional Defendants appear to have made this concession on the understanding the only constitutionally protected conduct at issue was Velasquez's filing of a grievance on February 18 regarding his medical care.  *See* Correctional Defs.' Mem. 10.  In his opposition to the Correctional Defendants' summary judgment motion, Velasquez contends the relevant constitutionally protected conduct includes other complaints he and his family members made regarding his medical care, including phone calls his brother made to DiGuglielmo's office and to Fishstein or Schweitzer on or about January 11 and informal grievances he sent to Stanishefski and Fixx on February 4.  This Court will assume, for summary judgment purposes, that all of this conduct was constitutionally protected.  *See Bendy v. Ocean Cnty. Jail*, 341 F. App'x 799, 802 (3d Cir. 2009) (noting plaintiff had arguably engaged in constitutionally protected conduct "by filing grievances about the medical care he was receiving and by complaining to prison officials").  Velasquez also refers to other, much earlier complaints he raised regarding his medical care in 1999.  *See* ECF No. 102 at 5, ¶ 4, *id.* at 2-9.  Because there is no evidence any of the Defendants in this case were aware of Velasquez's 1999 complaints, those complaints will not be considered as part of Velasquez's retaliation claim.  This Court also will not consider Velasquez's vague allegations regarding two corrections officers who

should be granted in their favor on this claim because there is an insufficient evidentiary basis on which a reasonable jury could find Velasquez's complaints and grievances were a substantial or motivating factor in the decisions to place him in administrative custody and to transfer him, and because there is no genuine issue of material fact that the same decisions would have been made, even absent Velasquez's complaints and grievance.

The record reflects the initial decision to place Velasquez in administrative custody on February 20 was made by Radle after receiving Schweitzer's February 19 letter outlining her security concerns about Velasquez and requesting a separation from him. Radle Decl. ¶ 7 & Ex. C. There is no evidence any of the other Correctional Defendants were involved in the placement,[27] and there is likewise no evidence Radle was aware of Velasquez's grievance or earlier complaints at the time he placed Velasquez in administrative custody. While Velasquez argues there is a factual issue as to whether the grievance coordinator received his grievance before Radle acted, he offers no evidence to contradict Radle's assertion in his declaration that he was not aware of the grievance. Nor is there any reason why Radle, who is not a medical professional, would have been aware of the grievance or other complaints, which concerned only Velasquez's medical care. Indeed, when the grievance was processed, it was sent to Stanishefski, a Correctional Health Care Administrator, for

---

he contends were fired in 2006 or 2007 as a result of his complaints. *See id.* at 5, ¶¶ 2-3. Although Velasquez contends Dohman and Lorenzo failed to respond to an official grievance he filed in connection with one of the complaints, he provides no details regarding the subject or contents of the grievance, and, by Velasquez's own account, the situation was resolved favorably to him. There is thus no basis on which to link the unspecified 2006–2007 grievance to alleged retaliation against Velasquez in 2008.

[27] The form regarding the transfer indicates Radle's action was reviewed and approved by the ranking correctional officer on duty, but the signature on the form does not appear to correspond to any of the Defendants in this case. *See* Radle Decl. Ex. C.

a response.  Although a plaintiff may establish the causation element of a retaliation claim by demonstrating an unusually suggestive temporal proximity between the protected conduct and the alleged retaliatory action, the evidence in this case is insufficient to permit a reasonable jury to find Velasquez's grievance and complaints were a substantial or motivating factor in the decision to place him in administrative custody.  *See Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 494 (3d Cir. 2002) (holding while "'suggestive temporal proximity' is relevant to establishing a causal link between protected conduct and retaliatory action," it does not show a defendant "was aware of the protected conduct in the first place").

The decision to return Velasquez to administrative custody on February 29 was made by Murray after receiving additional information from Schweitzer regarding the reasons for her separation request and after receiving information from Fishstein regarding his security concerns about Velasquez.  ECF No. 95 at 54.  Murray also determined, based on information from Schweitzer and Fishstein, that a separation was warranted.  *Id.*  Velasquez's administrative custody placement and transfer were thereafter upheld by the PRC, and sustained by DiGuglielmo and Mark. At the time these decisions were made, Velasquez had withdrawn his grievance, allegedly based on Murray's representation he would be treated by the medical department.  Because the grievance was no longer pending when the decisions regarding Velasquez's return to administrative custody and transfer were made, there is no basis on which to conclude the grievance was a substantial and motivating factor in those decisions.

Moreover, even if Velasquez could demonstrate a prima facie case of retaliation, he has failed to raise a genuine issue of material fact that the same decisions would have been made even absent his complaints.  In his declaration, Radle, whose duties include investigating claims by staff

26

members with personal safety concerns regarding inmates, states the practice at SCI–Graterford upon receiving such a claim is to place the inmate in administrative custody pending investigation and, if the investigation validates the security concern, to hold the inmate in the RHU until he or she is transferred to another facility.   Radle Decl. ¶ 2.   Radle followed this practice after receiving Schweitzer's February 19 letter, first placing Velasquez in administrative custody and then interviewing Schweitzer and reporting the results of his interview to DiGuglielmo, Lorenzo, Murray, and Williamson.   *Id.* ¶¶ 6-7.   Although the PRC initially declined Schweitzer's request for a separation, finding Velasquez's attempts to convince Schweitzer and others to change his medication did not warrant a separation, Schweitzer pursued the matter further and provided additional information, both from herself and a supervising psychiatrist.   Only after receiving the additional detail and corroboration regarding Schweitzer's security concerns did Murray direct that Velasquez be returned to administrative custody indicating he believed separation was warranted.

In opposing the Correctional Defendants' summary judgment motion, Velasquez points to various perceived procedural irregularities in Radle's investigation, noting Radle's failure to investigate Schweitzer's initial incident report more promptly after receiving it on January 15 and failure to indicate on the form memorializing Velasquez's transfer that he was under investigation as opposed to classifying him as a "danger to himself or others."   He also points to Schweitzer's admission that Velasquez "made no clear verbal threat of [her] personal safety."   ECF No. 95 at 49. These alleged irregularities do not permit the reasonable inference that Velasquez's situation would have been handled any differently absent his grievance and complaints.   Radle's alleged delay is inconsequential given the lack of any evidence he knew about Velasquez's complaints.   And there is no evidence Radle classified the reason for Velasquez's placement in administrative custody

incorrectly, especially given that Schweitzer agreed there was no clear verbal threat but a perception of threatening action.

Velasquez also maintains the Correctional Defendants colluded with Schweitzer, who fabricated security concerns about Velasquez.  But even if Schweitzer's security concerns were fabricated—and there is no evidence they were—there is no evidence the Correctional Defendants knew the concerns were not legitimate.  Moreover, the record refutes the suggestion the Correctional Defendants colluded with Schweitzer given the PRC's initial denial of Schweitzer's transfer request.

The separation of prison staff from inmates who pose personal security concerns clearly serves a legitimate penological interest.  *See Davis v. Pa. State*, 244 F. App'x 445, 447 (3d Cir. 2007) (holding decision to place inmate in administrative custody and transfer him to another prison due to a conflict of interest with a staff member is reasonably related to the security of the facility, a legitimate penological interest). Because the Correctional Defendants have shown Velasquez's administrative custody and transfer were because of Schweitzer's security concerns, and because Velasquez has not produced any evidence suggesting otherwise, summary judgment will be granted in favor of the Correctional Defendants on Velasquez's retaliation claim.  *See id.* (crediting prison's procedures for separating an inmate and a staff member when a conflict of interest arises).

Like the Correctional Defendants, Schweitzer argues Velasquez has failed to show her reports regarding her security concerns about Velasquez had anything to do with his February 18 grievance because there is no evidence she was aware of the grievance at any time before Velasquez filed his Amended Complaint.  While this Court agrees there is no evidence suggesting Schweitzer knew about the February 18 grievance when she requested a separation from Velasquez on February 19, there is evidence suggesting she was aware of earlier complaints by Velasquez or his family

28

members, specifically, his brother's January 11 call to DiGuglielmo, and his February 4 informal grievance to Fixx.  Although the timing of Schweitzer's separation request is suggestive in reference to these complaints, the record shows that Schweitzer's requests were the culmination of security concerns she had before learning of Velasquez's complaints.  In these circumstances, this Court concludes the record evidence is insufficient for a reasonable jury to find Velasquez's complaints were a substantial or motivating factor in Schweitzer's pursuit of a separation or that Schweitzer's security concerns were fabricated.

On January 11, Schweitzer completed an incident report regarding Velasquez's "inappropriate contact" with her the previous day.  Schweitzer Aff. Ex. D; ECF No. 95 at 34. Although Velasquez characterizes the incident report as "false and fabricated," he admits the encounter described therein occurred and agrees Schweitzer's description of the encounter (though not her reaction to it) is factually accurate.  Velasquez Dep. 125-26.  Velasquez takes issue with the timing of the report, noting prison policy would have required Schweitzer to submit it before leaving her shift on the day of the incident, but even assuming Velasquez is correct that the report should have been filed a day earlier, this Court "fail[s] to see how a possible technical problem with a corrections staff's report . . . could, in and of itself, morph an otherwise legitimate act into one demonstrating retaliatory motive." *Carter v. Morrisson*, 429 F. App'x 114, 119 (3d Cir. 2011). Because Schweitzer completed the incident report the same day Knauer contacted her regarding Velasquez's brother's call to the Superintendent's office, it is possible she was aware of the call when preparing the report.  Given the lack of evidence in the record regarding the content of the call or Knauer's discussion with Schweitzer about the call, however, there is no basis on which a reasonable jury could find the call was a substantial or motivating factor in Schweitzer's submission

29

of the report on January 11.[28]

After submitting the incident report, and before receiving any further complaints from Velasquez, Schweitzer continued to express security concerns regarding Velasquez.  In her January 15 progress notes, Schweitzer characterized Velasquez as having become "verbally intimidating" when she declined to discuss medication issues with him on January 10.  Schweitzer Ex. D.  While Schweitzer did not request a separation from Velasquez until February 19, she appears to have raised the issue as early as the January 16 PRT meeting, as Dromboski noted in his summary of the meeting that Schweitzer had "deferred requesting a separation while waiting to see if the PRT action would diffuse the matter," but was "concerned that the matter of her personal security over feelings the inmate may have about his care is not resolved."  Schweitzer Ex. E.  Even if Schweitzer was aware of Velasquez's informal complaint to Fixx when she ultimately requested a separation, these documented security concerns, which were corroborated by Dr. Fishstein, refute any inference that the separation request was retaliatory.  At a minimum, this evidence refutes any suggestions Schweitzer's security concerns were fabricated.

Velasquez's efforts to create a genuine factual issue as to whether Schweitzer's security concerns were fabricated or causally related to his complaints and grievance are unavailing. Velasquez argues Schweitzer had no reason to pursue her security concerns with Radle because King

---

[28] Knauer's note itself says only that Velasquez's brother was "concerned over [a] phone call to Dr. Fishstein" and that Knauer spoke with Fishstein and Schweitzer and Velasquez was "being followed [with an] appropriate treatment plan."  ECF No. 100-2 at 14.  In his affidavit, Velasquez's brother references a call to the Superintendent's office in which he asked a secretary for help, but he does not specify what concerns he raised.  ECF No. 102-1 at 49.  Velasquez's brother also states he contacted "Doctor Schweitzer" about Velasquez's medical condition and medication, but there is no indication when this call occurred or what was discussed.  Indeed, if anything, Velasquez's brother's concerns appear to have related to the side effects Velasquez suffered from Trazodone, an aspect of his care with which there is no evidence Schweitzer had any involvement.

had advised him on January 15 he would no longer be seen by psychiatry.  But even if this were true

(and it is not clear it is, *see supra* n.5), there is no evidence Schweitzer was aware of it.  To the

contrary, the evidence suggests she was told the PRT decision was not communicated to Velasquez

until February 11, nearly a month after the decision had been made.  Velasquez also argues

Schweitzer's concerns must have been fabricated because if he truly had threatened her, she would

have been required to charge him via a misconduct report and he would have been placed in the

RHU immediately.  As Schweitzer herself agreed, however, she did not contend Velasquez had made

a "clear verbal threat of [her] personal safety"; rather, she sought a separation because she perceived

his actions toward her to be threatening.  And while Velasquez makes much of the fact that

Schweitzer's incident report and letters to Radle are not date-stamped, the references to these

documents in dated emails validates the time frame in which they were created.  In sum, Velasquez

has produced no evidence to create genuine factual issue as to whether Schweitzer's security

concerns were fabricated or causally related to his complaints and grievance.  Therefore, summary

judgment will be granted in Schweitzer's favor on Velasquez's First Amendment retaliation claim.

Velasquez also brings an Eighth Amendment claim against the Correctional Defendants,

alleging these Defendants were deliberately indifferent to his need for treatment for his insomnia.

Deprivation of medical care violates a prisoner's Eighth Amendment rights when prison officials

exhibit deliberate indifference to the inmate's serious medical needs.[29]  *See Spruill*, 372 F.3d at 235.

---

[29] Although the Correctional Defendants do not question, for summary judgment purposes, that insomnia constitutes a serious medical need, the weight of authority appears to be to the contrary. *See, e.g.*, *Jackson v. Bulloch Cnty. Jail*, No. 607-079, 2008 WL 2437421, at *3 (S.D. Ga. June 16, 2008) ("Insomnia does not normally qualify as a serious medical need."); *Kirkland v. Dep't of Corr.*, No. 07-2134, 2007 WL 4365330, at *4 (D.N.J. Dec. 11, 2007) (holding medical injury of anxiety and insomnia "cannot qualify as a severe medical need"); *Smith v. Crose*, No. 06-3168, 2006 WL 2591075, at *5 (D.N.J. Sept. 8, 2006) (dismissing Eighth Amendment claim based on doctor's denial

The Third Circuit has recognized a number of situations in which deliberate indifference may be found, including "[w]here prison officials deny reasonable requests for medical treatment . . . and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury'"; "where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care'"; and "'[w]hen . . . prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to [a] physician capable of evaluating the need for such treatment.'" *Monmouth Cnty. Corr. Institutional Inmates*, 834 F.2d at 346-47 (citations omitted). Allegations of malpractice or "mere disagreement as to the proper medical treatment," however, are insufficient to support an Eighth Amendment violation. *Id.* at 346.

Where, as here, a prisoner is under the care of medical professionals, "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill*, 372 F.3d at 236. "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.*

Velasquez argues Stanishefski, Murray, Lorenzo, Williamson, DiGuglielmo, Radle, Banta, Beard, and Mark all knew, based on grievances or other complaints he submitted to them, that he was not being treated for his insomnia, but failed to intervene.[30] Upon review of the exhibits cited

---

of psychiatrist-prescribed sleeping medication and holding "while Petitioner might have been substantially inconvenienced by Petitioner's insomnia, Petitioner's reduced ability to fall asleep does not amount to a serious medical need"); *cf. Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (holding a serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention" (citation omitted)).

[30] Velasquez does not identify any basis for a deliberate indifference claim against Dohman.

by Velasquez, however, the Court concludes they are insufficient to raise a genuine factual issue as to whether these Defendants were deliberately indifferent.

The record reflects that even while Velasquez was in administrative custody, he was seen regularly by medical personnel.  Moreover, although Dr. Stefanic declined to prescribe any medication for Velasquez's insomnia, it is undisputed Stefanic implemented a treatment plan of having Velasquez attempt to obtain a natural sleep pattern when he saw Velasquez on March 19. As part of this treatment plan, Velasquez received education on how to obtain a natural sleep pattern. While Velasquez strenuously disagreed with Stefanic's treatment plan and believed he needed medication, nothing in the record suggests Stefanic's plan was not a legitimate treatment for insomnia.

A number of the documents Velasquez relies on to show the Correctional Defendants had reason to believe medical staff were mistreating or not treating him pertain to the period before he saw Dr. Stefanic on March 19.  None of these documents suggests these Defendants had the requisite mental state.

For example, although Velasquez cites to Knauer's January 11 progress note regarding Velasquez's brother's call to DiGuglielmo's office, the note itself makes no reference to Velasquez's insomnia, and there is no evidence any of the Correctional Defendants—including DiGuglielmo, whose secretary took the call—were aware of the call in any event.

Velasquez also suggests Defendants were made aware of Eighth Amendment violations via his February 4 memo to Fixx.  Again, there is no evidence any of the Correctional Defendants saw the memo (only DiGuglielmo was copied on it), and while the memo relates Velasquez's dissatisfaction with certain medications prescribed by the mental health department and desire for

a particular medication, it appears to reflect Velasquez's effort to resolve his medication concerns within the mental health department.

Nor is there any reason emails notifying Stanishefski of the PRT decision to remove Velasquez from the mental health roster would have given Stanishefski reason to believe Velasquez was being denied any needed medical treatment.  To the contrary, the emails indicate the PRT decision was based on the agreement of the various medical and mental health professionals involved that Velasquez had "no identifiable, psychiatric disorder" requiring mental health treatment, and they also indicate the medical department would "subsume all [of Velasquez's] treatment needs."  ECF No. 102-1 at 41.

Velasquez's reliance on Murray's February 27 email notifying Stanishefski, DiGuglielmo, Williamson, Lorenzo, and Radle of the PRC's decision to return Velasquez to the general prison population is likewise unavailing.  In his email, Murray alludes to Velasquez's removal from "[mental health] tracking"; however, he notes Velasquez "will be evaluated by appropriate staff and if required, prescribed appropriate medications."  ECF No. 102-1 at 48.

Velasquez also cites to Stanishefski's response to his February 18 grievance regarding efforts to prevent him from obtaining treatment for his insomnia, in which Stanishefski informed Velasquez he had missed a February 21 appointment with Dr. Stefanic but advised another appointment would be scheduled for him.  ECF No. 102-1 at 53.  Far from suggesting deliberate indifference, Stanishefski's response reflects his affirmative efforts to obtain medical treatment for Velasquez.

Velasquez also contends certain of the Defendants had reason to know he was being denied needed medical treatment based on his appeals from the PRC's March 5 decision upholding his return to administrative custody and related complaints.  Although the appeals referenced

34

Velasquez's insomnia, for which he was seen at sick call on February 29, they primarily concerned the propriety of his placement in administrative custody, rather than any ongoing medical concerns, and DiGuglielmo and Mark reasonably treated them as such.

The remaining documents cited by Velasquez as evidence of the Correctional Defendants' deliberate indifference concern complaints Velasquez made around the time he saw Stefanic about his insomnia or after Stefanic implemented a treatment plan.  Like the documents from the prior period, many of these documents are primarily challenges to Velasquez's administrative custody placement.  Moreover, even as to complaints regarding Velasquez's medical care during this period, because the record reflects Velasquez was being treated for his insomnia, the Defendants cannot be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by a prison doctor."  *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993); *see also Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 113 (3d Cir. 2007) (holding where prison medical staff was providing medical consultation and evaluation, non-physician defendants to whom prisoner had complained he was not getting the medication he needed were not deliberately indifferent "for failing to second-guess the medical staff's appraisal of the situation").  Accordingly, because there is an insufficient evidentiary basis for a reasonable jury to find the Correctional Defendants were deliberately indifferent, summary judgment will be granted in favor of the Correctional Defendants on Velasquez's Eighth Amendment claim.

Finally, Velasquez alleges his placement in administrative custody and transfer to another prison violated his due process rights.  To establish a due process violation, Velasquez must show he was deprived of a legally cognizable liberty interest.  *Mitchell v. Horn*, 318 F.3d 523, 531 (3d Cir.

2003).  "For a prisoner, such a deprivation occurs when the prison 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Id.* (quoting *Sandin v. Conner*, 515 F.3d 472, 484 (1995)).[31]  "[A] prisoner does not have a liberty interest in remaining in a preferred facility within a state's prison system," *Asquith v. Dep't of Corr.*, 186 F.3d 407, 410 (3d Cir. 1999); *see also Franco v. Bureau of Prisons*, 207 F. App'x 145 (3d Cir. 2006); hence, Velasquez cannot show his transfer violated his due process rights.  With respect to his placement in administrative custody, Velasquez argues the conditions of his confinement in the RHU imposed an atypical hardship because Defendants violated his Eighth Amendment rights by depriving him of medical care.  Whether Velasquez's Eighth Amendment rights were violated, however, is not dispositive of whether he has a liberty interest in freedom from confinement in the RHU.  *See Ball v. Beard*, 396 F. App'x 826, 828 (3d Cir. 2010) (noting "[d]ue process and Eighth Amendment claims . . . are distinct").  "[T]he baseline for determining what is 'atypical and significant' . . . is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction."  *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997).  Here, Velasquez spent approximately four months in administrative custody, which is well within the "expected parameters of the sentence imposed [on him]."  *Id.* at 708 (holding "exposure to the conditions of administrative custody for periods as long as 15 months" is not atypical).  Because Velasquez has not shown he had a legally cognizable liberty interest in his placement in the RHU or his transfer to another prison, summary judgment will be granted in favor of the Correctional Defendants on Velasquez's due

---

[31] Prisoners also have "a protected liberty interest in avoiding restraints that 'exceed[] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force,'" such as involuntary administration of psychotropic medication or involuntary transfer to a state mental hospital for treatment.  *Id.* at 531 n.4 (quoting *Sandin*, 515 U.S. at 484).  Velasquez, however, does not contend he was subject to a restraint of this type.

process claim.[32]

For the reasons set forth above, the Defendants' summary judgment motions will be granted in their entirety.  An appropriate order follows.

BY THE COURT:

_____/s/ Juan R. Sánchez_____
Juan R. Sánchez, J.

---

[32] Insofar as Velasquez contends the Correctional Defendants deprived him of due process by not telling him why he was being placed in the RHU, his lack of a legally cognizable liberty interest is also fatal to this claim.  *See Jenkins v. Murray*, 352 F. App'x 608, 610 (3d Cir. 2009) (holding housing prisoner in administrative custody for three months without notice and a hearing, as required by DC–ADM 802, does not state a claim for a due process violation).